# Exhibit 1

FILED
2026 JUL 21 A 11:45

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

Electronically FILED by Superior Court of California, County of Los Angeles
7/16/2026 3:03 PM
David W. Slayton, Executive Officer/Clerk of Court,
By S. Ruiz, Deputy Clerk

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
COUNTY OF LOS ANGELES, a public entity; LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, a public entity; ROBERT LUNA, individually and in his official capacity as Sheriff of Los Angeles County; THOMAS GIANDOMENICO, individually and in his official capacity as a Commander of the Los Angeles County Sheriff's Department; and DOES 1 through 50, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
ALEXIS LEMUS, an individual

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Los Angeles Superior Court
111 North Hill Street, Los Angeles CA 90012

CASE NUMBER: *(Número del Caso):* 26STCV22430

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
David G. Torres-Siegrist, Torres-Siegrist Law, 440 East Huntington Drive, Suite 300, Arcadia CA 91006; 626-277-5330

DATE: *(Fecha)* 07/16/2026 Clerk, by *(Secretario)* David W. Slayton, Executive Officer/Clerk of Court S. Ruiz, Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]



**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☒ other *(specify):* Public entity

4. ☒ by personal delivery on *(date):* 7/20/26



Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

SUMMONS

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

2026 JUL 21 A 11:45

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

Electronically FILED by Superior Court of California, County of Los Angeles
7/16/2026 3:03 PM
David W. Slayton, Executive Officer/Clerk of Court,
By S. Ruiz, Deputy Clerk

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
COUNTY OF LOS ANGELES, a public entity; LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, a public entity; ROBERT LUNA, individually and in his official capacity as Sheriff of Los Angeles County; THOMAS GIANDOMENICO, individually and in his official capacity as a Commander of the Los Angeles County Sheriff's Department; and DOES 1 through 50, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
ALEXIS LEMUS, an individual

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Los Angeles Superior Court
111 North Hill Street, Los Angeles CA 90012

CASE NUMBER:
*(Número del Caso):*
26STCV22430

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
David G. Torres-Siegrist, Torres-Siegrist Law, 440 East Huntington Drive, Suite 300, Arcadia CA 91006; 626-277-5330

DATE: 07/16/2026
*(Fecha)*

Clerk, by David W. Slayton, Executive Officer/Clerk of Court, Deputy
*(Secretario)* S. Ruiz *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* COUNTY OF LOS ANGELES, a public entity

   under:
   ☐ CCP 416.10 (corporation)
   ☐ CCP 416.20 (defunct corporation)
   ☐ CCP 416.40 (association or partnership)
   ☐ CCP 416.60 (minor)
   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.90 (authorized person)
   ☒ other *(specify):* Public entity
4. ☒ by personal delivery on *(date):* 7/20/26



Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

Electronically FILED by Superior Court of California, County of Los Angeles 7/16/2026 3:03 PM David W. Slayton, Executive Officer/Clerk of Court, By S. Ruiz, Deputy Clerk

DAVID G. TORRES-SIEGRIST, ESQ. (State Bar No. 220187)
TORRES | SIEGRIST Law, APC
440 East Huntington Drive
Suite 300
Arcadia, CA 91006
Phone: (626) 277-5330
Facsimile: (626) 507-6460
Email: dgts@DGTSLaw.com

SHAWNA S. NAZARI, ESQ. (State Bar No. 214939)
**NAZARI LAW**
2625 Townsgate Rd., Suite 330
Westlake Village, Ca 91361
Phone: 818-380-3015
Facsimile: 818-380-3016
Email: snazari@ssnlegal.com

Attorneys for Plaintiff ALEXIS LEMUS

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| ALEXIS LEMUS, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, a public entity; LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, a public entity; ROBERT LUNA, individually and in his official capacity as Sheriff of Los Angeles County; THOMAS GIANDOMENICO, individually and in his official capacity as a Commander of the Los Angeles County Sheriff's Department; and DOES 1 through 50, inclusive,<br><br>Defendants. | **Case No.:** 26STCV22430<br><br>**COMPLAINT FOR DAMAGES:**<br><br>1. WRONGFUL DEATH: NEGLIGENCE (Code Civ. Proc. § 377.60; Gov. Code §§ 815.2, 820, 835, 835.2)<br>2. VIOLATION OF CIVIL RIGHTS: DEPRIVATION OF FAMILIAL RELATIONSHIP AND FAMILY INTEGRITY (42 U.S.C. § 1983; Monell)<br><br>**DEMAND FOR JURY TRIAL** |

///

///

///

Plaintiff ALEXIS LEMUS alleges as follows:

## INTRODUCTION

1. On the morning of July 18, 2025, at approximately 7:30 a.m., Detective Victor Lemus, a decorated 22-year veteran of the Los Angeles County Sheriff's Department ("LASD" or the "Department") was killed when a military hand grenade detonated in the parking lot of the Department's Special Enforcement Bureau ("SEB") at the Eugene W. Biscailuz Regional Training Center in East Los Angeles. Two of his fellow detectives, Joshua Kelley-Eklund and William Osborn, died beside him. Sheriff Robert Luna called it the deadliest single day for the Department since 1857.

2. Victor Lemus did not die because bomb work is inherently and unavoidably deadly. He died because the County of Los Angeles and its Sheriff's Department have, for a decade, put money before their people and place unqualified incompetent individuals in supervisory roles.

3. In 2015, the Department consolidated its Arson/Explosives Detail into the Special Enforcement Bureau. On paper, the consolidation was billed as operational streamlining. In practice, it was the public-sector equivalent of a ruthless corporate merger: the bomb squad was swallowed by a larger division, its budget was raided, and funds historically earmarked for bomb-squad training and equipment were diverted to other SEB priorities. Like the acquired company in a hostile takeover, stripped for parts while executives tout "synergies," the Arson/Explosives Detail kept its name and lost nearly everything else: its funding, its equipment pipeline, and its capacity to train its own people.

4. The consequences of that bargain were visible everywhere at SEB, for anyone in command who cared to look. While the Los Angeles Police Department maintains a state-of-the-art bomb laboratory and disposal facility, LASD bomb technicians are relegated to performing render-safe and disposal procedures in the open cement gutters of the SEB facility. The Department's bomb-technician protective suits are, on information and belief, two full generations behind current technology. Its portable X-ray devices, the very instruments technicians must rely upon to determine whether an explosive device is live or inert, are approximately twenty years old. The Department maintains no written explosives-handling procedures of its own. And until a deputy completes the

FBI's Hazardous Devices School, the only school in the nation that trains and certifies public-safety bomb technicians, the Department offers nothing more than informal, unstructured "on the job" training. Veteran Department personnel saw it too: in the months before the explosion, veteran personnel warned supervisors in writing about the unit's training deficiencies, and Deputy Digby told the Detail's Captain that the unit was so undertrained that someone would be killed.

5. Into this underfunded, undertrained, and under-equipped unit the Department forced Victor Lemus, a man with no experience or training whatsoever in explosives. Detective Lemus had spent his entire career earning his way to one of the Department's most coveted assignments: K-9 handler with SEB's SWAT element. When his canine partner bit a third-party homeowner during an apprehension of a criminal suspect, an incident in which neither Detective Lemus nor his canine committed any intentional wrongdoing, Department command staff seized upon the resulting litigation as a pretext to strip him of his K-9 SWAT position. Detective Lemus was involuntarily "lateraled" to the Arson/Explosives Detail, a unit for which he had no training, no certification, and no background.

6. The Department did not send Detective Lemus to the FBI's Hazardous Devices School before putting him to work handling explosives. Instead, it scheduled him to attend in October 2025. He was killed in July 2025, three months before the training that might have saved his life, having received nothing but "on the job" training from a unit that itself had no written procedures to teach.

7. Even on the last morning of his life, the Department's priorities were on display. On information and belief, Detective Lemus and the two other decedents were directed to report to the SEB facility early on July 18, 2025, to participate in and support the filming of a music video for a country-music artist at the facility. It was only after the video shoot that the detectives turned to the grenades that had been recovered the previous day, grenades that a twenty-year-old X-ray machine had falsely pronounced inert. The Department found the time, personnel, and facility access for a promotional video shoot; it never found the money to properly train or equip the men it sent to handle live ordnance.

8. The California Division of Occupational Safety and Health ("Cal/OSHA") has since confirmed what Detective Lemus's complaints warned of in his lifetime. On January 16, 2026,

Cal/OSHA cited the Department for eight violations arising from the explosion, including two willful violations for failure to correct known unsafe conditions and failure to train, and assessed $351,000 in penalties. The Department's response was of a piece with its conduct throughout: it stonewalled the investigation, produced an incident report redacted down to two visible lines, ignored an administrative subpoena as to seventeen of nineteen document categories, and forced the State of California to petition the Superior Court to compel compliance.

9. Plaintiff Alexis Lemus, Detective Lemus's daughter, brings this action individually as his heir to hold the County accountable for a death that was not an accident of fate but the foreseeable, and a foreseen product of a decade of institutional choices that valued dollars over deputies.

## THE PARTIES

10. Plaintiff ALEXIS LEMUS ("Plaintiff") is, and at all relevant times was, an individual residing in the City of Chino, County of San Bernardino, State of California. Plaintiff is the surviving daughter of decedent Victor Lemus ("Decedent" or "Detective Lemus") and is entitled to bring an action for his wrongful death pursuant to Code of Civil Procedure section 377.60, subdivision (a).

11. Decedent VICTOR LEMUS died on July 18, 2025, in the County of Los Angeles, State of California. At the time of his death, Decedent was a Detective with the LASD assigned to the Arson/Explosives Detail of the Special Enforcement Bureau. The Los Angeles County Department of Medical Examiner determined that Decedent died of multiple blast injuries.

12. Defendant COUNTY OF LOS ANGELES (the "County") is, and at all relevant times was, a public entity duly organized and existing under the laws of the State of California. The County operates, funds, manages, supervises, and controls the LASD, including the Special Enforcement Bureau and its Arson/Explosives Detail, and the Eugene W. Biscailuz Regional Training Center located at 1060 North Eastern Avenue, East Los Angeles, California.

13. Defendant LOS ANGELES COUNTY SHERIFF'S DEPARTMENT ("LASD") is, and at all relevant times was, a public entity and/or subdivision or agency of the County of Los Angeles. The County and LASD are collectively referred to herein as the "Entity Defendants."

14. Defendant ROBERT LUNA ("Luna" or the "Sheriff") is, and at all relevant times was,

the Sheriff of Los Angeles County, an elected official of the County responsible for overseeing the LASD and for making and implementing its policies, and whose edicts and acts may fairly be said to represent official policy of the LASD. Luna is sued herein in his individual capacity and in his official capacity. Plaintiff is informed and believes, and thereon alleges, that Luna resides in the County of Los Angeles.

15. Defendant THOMAS GIANDOMENICO ("Giandomenico") is, and at all relevant times was, a Commander of the LASD and a member of its command staff. Giandomenico is sued herein in his individual capacity and in his official capacity. Plaintiff is informed and believes, and thereon alleges, that Giandomenico resides in the County of Los Angeles.

16. Defendants DOES 1 through 50, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to Plaintiff, and Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes, and thereon alleges, that each fictitiously named Defendant is an employee, supervisor, manager, commander, executive, or policymaker of the Entity Defendants, including members of LASD command staff who ordered or ratified Decedent's retaliatory transfer, denied his requests for training, diverted funding from the Arson/Explosives Detail, and/or permitted untrained personnel to handle live ordnance with obsolete equipment, and that each is responsible in some manner for the occurrences alleged herein and for Plaintiff's damages. The individually named DOE Defendants are sued in their individual capacities.

17. Plaintiff is informed and believes, and thereon alleges, that at all relevant times each Defendant was the agent, servant, employee, and/or joint venturer of each of the remaining Defendants and was acting within the course and scope of such agency and employment, with the knowledge, consent, permission, and ratification of the remaining Defendants. Pursuant to Government Code section 815.2, subdivision (a), the Entity Defendants are vicariously liable for the acts and omissions of their employees committed within the scope of their employment.

18. Decedent's other heirs are Nancy Lemus, his surviving spouse and Plaintiff's stepmother, and V.M.L. and E.J.L., his surviving minor daughters and Plaintiff's half-sisters. Plaintiff is informed and believes, and thereon alleges, that on or about July 13, 2026, Nancy Lemus,

individually, as administrator of Decedent's estate, and as guardian ad litem for the minor heirs, filed her own action arising out of Decedent's death in this Court (the "Related Action"), asserting, among other things, claims for the wrongful death of Decedent, and naming Plaintiff therein as a nominal defendant pursuant to Code of Civil Procedure section 382. All of Decedent's heirs are accordingly before the Court, and Plaintiff will seek consolidation, coordination, or joinder of this action with the Related Action as appropriate, consistent with the one action rule applicable to wrongful death claims.

**JURISDICTION AND VENUE**

19. This Court has jurisdiction over this action pursuant to Article VI, section 10 of the California Constitution and Code of Civil Procedure section 410.10. The amount in controversy exceeds the jurisdictional minimum for unlimited civil cases.

20. Venue is proper in this Court pursuant to Code of Civil Procedure sections 394 and 395 because the acts, omissions, and injuries giving rise to this action occurred in the County of Los Angeles, and because Defendant County of Los Angeles is situated therein.

**COMPLIANCE WITH THE GOVERNMENT CLAIMS ACT**

21. On January 16, 2026, within six months of the accrual of the causes of action alleged herein, Plaintiff timely presented a written claim for damages to the County of Los Angeles pursuant to Government Code sections 905, 910, 910.2, and 911.2, by delivering said claim to the Executive Officer of the Board of Supervisors of the County of Los Angeles. The claim set forth the date, place, and circumstances of the occurrence, the names of the public employees involved insofar as known, a description of the injuries and damages incurred, and the legal theories upon which liability is asserted, including the theories alleged in this Complaint.

22. More than 45 days have elapsed since the presentation of Plaintiff's claim. The County failed to act upon the claim within 45 days, and the claim is therefore deemed rejected by operation of law pursuant to Government Code section 912.4, subdivision (c), on or about March 2, 2026. [To the extent the County served written notice of rejection, this action is filed within six months thereof pursuant to Government Code section 945.6, subdivision (a)(1).] This action is timely filed.

23. Plaintiff's cause of action under 42 U.S.C. section 1983 is not subject to the claim

presentation requirements of the Government Claims Act.

## GENERAL ALLEGATIONS

### A. The 2015 Consolidation: A Corporate-Style Merger That Gutted the Bomb Squad

24. For decades, the LASD maintained a dedicated Arson/Explosives Detail responsible for responding to, rendering safe, and disposing of suspected explosive devices throughout Los Angeles County, the most populous county in the United States. Plaintiff is informed and believes, and thereon alleges, that prior to 2015 the Arson/Explosives Detail had its own budget lines, funding streams, and equipment allocations earmarked for bomb-squad training, protective equipment, diagnostic technology, and facilities.

25. In or about 2015, the Department consolidated the Arson/Explosives Detail into the Special Enforcement Bureau. Plaintiff is informed and believes, and thereon alleges, that the consolidation was undertaken to reduce costs and consolidate budgets, not to improve the safety or effectiveness of bomb-disposal operations.

26. Plaintiff is informed and believes, and thereon alleges, that following the consolidation, funds that had historically been earmarked for the bomb squad's training, equipment, and facilities were diverted to other aspects and priorities of SEB. The Arson/Explosives Detail became, in effect, the unwanted subsidiary of a corporate acquisition: absorbed for its budget, starved of reinvestment, and left to operate on the leavings of the larger enterprise. As in the classic corporate-merger playbook, the “cost savings” were extracted from the acquired unit, and the risks created by those savings were borne not by the executives who made the decision, but by the line personnel who had to live (and die) with it.

27. The results of this decade of disinvestment included, on information and belief, each of the following, all of which existed on July 18, 2025, and all of which were known to the Entity Defendants and to DOE command staff and policymakers:

28. **No bomb laboratory or proper disposal facility.** Whereas the neighboring Los Angeles Police Department maintains a state-of-the-art bomb laboratory and disposal facility for its bomb squad, the LASD provided its bomb technicians with no comparable facility. LASD bomb technicians were instead relegated to using the open cement gutters at the SEB facility at the

Biscailuz Center to conduct render-safe procedures, examinations, and disposal operations involving suspected explosive devices.

29. **Obsolete protective equipment.** The bomb-technician protective suits available to the Arson/Explosives Detail were approximately two generations behind current available technology, providing materially less blast protection than the equipment routinely fielded by comparable agencies.

30. **Twenty-year-old diagnostic X-ray equipment.** The portable X-ray devices used by the Detail to evaluate suspected ordnance, the single most important diagnostic step in determining whether a device is live or inert, were approximately twenty years old, unreliable, and prone to producing inadequate or misleading images.

31. **No written procedures.** The Department maintained no written explosives-handling procedures of its own. In an August 29, 2025 interview with Cal/OSHA Senior Safety Engineer Dien Nguyen, LASD Lieutenant David Auner admitted that LASD does not have its own written explosive-handling procedures and instead purports to follow the guidelines of the National Association of Bomb Squad Commanders, guidelines which, when Cal/OSHA asked for the version LASD purportedly followed at the time of the incident, LASD failed and refused to produce.

32. **No formal training before certification.** The FBI's Hazardous Devices School at Redstone Arsenal, Alabama, is the only school in the United States that trains and certifies public-safety bomb technicians. Until a deputy assigned to the Arson/Explosives Detail completes the Hazardous Devices School, the Department provides only informal, unstructured "on the job" training, training conducted by a unit that itself possessed no written procedures, no modern equipment, and no proper facility.

33. Each of these deficiencies was longstanding, obvious, documented, and known to the Entity Defendants and DOE policymakers, who nonetheless elected, year after year, to allocate available funds elsewhere. The choice was deliberate. The Department understood that it was fielding a bomb squad without the training, equipment, facilities, or procedures that the work demanded, and it accepted the risk of catastrophic injury or death to its deputies as the price of the savings.

**B. The Department Was Expressly Warned: Pre-Explosion Alarms from Veteran Personnel and the Known Unfitness of Commander Oscar Barragan.**

34. The deficiencies alleged above were not merely obvious to anyone in command who cared to look. They were expressly and repeatedly called to the attention of the Department's supervisors and executives before the explosion, in writing, by veteran members of the Department with decades of institutional knowledge of the Arson/Explosives Detail and of SEB.

35. Prior to the July 18, 2025 explosion, multiple veteran personnel sent emails to Department supervisors warning of the training deficiencies within the Arson/Explosives Detail. Plaintiff is informed and believes, and thereon alleges, that these written warnings were sent to, among others, Under Sheriff Tardy, Commander Thomas Giandomenico, and Commander Oscar Barragan.

36. Deputy Michael Digby served in the Detail as a retiree hire back following his retirement from the Department, and he separated from that assignment only a few months before Detective Lemus was killed. Before leaving, Deputy Digby personally told the Detail's then current Captain, Robbie Royster, in words or substance, that the bomb squad unit was so undertrained that someone would be killed. No warning could have been more explicit, and none proved more accurate when this fatal tragedy was brought to fruition mere months later.

37. Plaintiff is informed and believes, and thereon alleges, that following the explosion, both Commander Giandomenico and Commander Barragan were relieved of duty and Baragan was recently terminated. The Department's own personnel actions after the explosion concede what its inaction before the explosion denied: the warnings were true, and the danger was known.

38. Particularly Barragan's presence in the chain of command over the Arson/Explosives Detail was itself a known hazard. Since at least October 2022, when a lawsuit styled Garrido v. County of Los Angeles, Los Angeles County Superior Court Case No. 22STCV33687, was filed, the Department was on express notice that Barragan had a documented history of incompetence at LASD, including a reputation that he was unable to make proactive arrests and was afraid of testifying in court.

39. As detailed in the Garrido action: while a deputy at SEB, Barragan was known as a

coward because he abandoned a team plan and retreated into an apartment room while the rest of his team continued to engage an armed suspect who was firing at them during a hostage rescue operation. As a Sergeant at East Los Angeles Station, Barragan was relieved of his field supervisor assignment after moving two dead bodies into a gutter, for no reason, during a double homicide crime scene. The now retired Commander with the initials R.W. who relieved him stated that it was the worst supervised scene he had ever been involved in and that he had never experienced "such stupidity" by a Department supervisor.

40. As a Sergeant, Barragan briefly served as the driver for then Sheriff James McDonnell. Barragan was caught manipulating his time sheets to incorporate the overtime he had "always wanted" and was warned by the Sheriff's executive staff to discontinue the practice. When he continued, Barragan was told that he could no longer represent the Sheriff and was asked to leave the prestigious assignment. During his tenure as a Lieutenant, Barragan was never entrusted with the role of Watch Commander. While assigned as a Lieutenant at Operations Safe Streets, Barragan was consistently late with use of force documents, personnel complaints, and other administrative paperwork; he attempted to hand off complaint investigations to a Sergeant because he was too incompetent and lazy to handle them, and the Sergeant refused to do Lieutenant Barragan's work; and he failed to respond in a timely manner to a deputy involved shooting directly involving the Gang Surveillance team he was assigned to supervise, an issue about which he was counseled.

41. Barragan also frequently engaged in other misconduct at LASD. In November 2020, Barragan falsified and submitted a memorandum to his unit commander requesting payment of 160 hours of his excess vacation time, stating that he intended to retire in December 2021. Barragan doctored the memorandum so that he would be paid for 160 hours rather than the 80 hours to which all Division Chiefs had directed their personnel to reduce their balances at the time. While assigned to SEB, Barragan continued to mishandle administrative paperwork and to mismanage calls and overtime. Personnel assigned to Operations Safe Streets and to SEB acknowledged that Barragan was rarely found at work, just as in his previous assignments, and that Barragan used SEB teams to serve warrants that did not meet the criteria for the use of a SWAT team, for his own personal gain, to create the appearance that he was hard at work.

42. Most fatally for the personnel of the Arson/Explosives Detail, when the bomb squad and arson personnel were scheduled to train, Barragan instead had personnel skip training to work protection details for the Board of Supervisors and other non-squad activities. The single resource that Detective Lemus and his colleagues most desperately needed, training, was traded away by a supervisor whom the Department had known for years to be unfit. Notwithstanding the written warnings by veteran personnel, including Deputy Digby, and notwithstanding years of notice of Barragan's unfitness, the Entity Defendants and DOE policymakers took no corrective action before July 18, 2025.

**C. Victor Lemus: A Career Destroyed by Retaliation and Cronyism**

43. Victor Lemus joined the LASD on or about July 1, 2003, and served the Department with distinction for 22 years. He worked assignments at the Twin Towers Correctional Facility and Century Station, where he served as a Senior Training Officer and Detective, and was repeatedly commended for mentoring and training deputies.

44. Detective Lemus spent his career working toward one goal: a position as a K-9 handler with SEB's SWAT element, among the most selective and coveted assignments in the Department. He achieved that goal in or about 2017, when he was assigned to SEB as a K-9 handler, a position he held and excelled in for approximately seven years.

45. During his K-9 SWAT service, Detective Lemus's canine partner bit a third-party homeowner in the course of an apprehension of a criminal suspect. The incident generated civil litigation against the County. Neither Detective Lemus nor his canine committed any intentional wrongdoing in connection with the incident, and Detective Lemus was never found to have violated any Department policy in connection with it.

46. Plaintiff is informed and believes, and thereon alleges, that DOE command staff seized upon the bite incident and its attendant litigation as a pretext to remove Detective Lemus from his K-9 SWAT position so that the position could be given to a personal associate and favored crony of command staff. The removal was not based on merit, performance, discipline, or operational need.

47. On or about June 2, 2024, Detective Lemus was involuntarily transferred ("lateraled") to the Arson/Explosives Detail. Detective Lemus had no experience, background, education, or

training of any kind in arson investigation or explosives handling. The transfer of an untrained deputy into a bomb squad, as punishment and pretext, was itself an act of deliberate indifference to Detective Lemus's safety.

48. Plaintiff is informed and believes, and thereon alleges, that under Department policy and practice, until he completed formal training Detective Lemus was not to be in the immediate presence of live explosive devices.

49. The Department assigned Detective Lemus to work with Detectives Joshua Kelley-Eklund and William Osborn, and the Department provided no adequate supervision, facilities, training or equipment. Lax supervision, inexperience, and the absence of any formal training substantially increased the likelihood that a tragedy would occur.

50. Detective Lemus objected to the transfer and documented, the dangers posed by assigning him to bomb-disposal duties without training. In the weeks and months leading up to July 18, 2025, Detective Lemus complained to his supervisors and to Department management identifying known and serious safety risks inherent in bomb-disposal operations, including the lack of training, the state of the Detail's equipment, and unsafe practices, and he explicitly and repeatedly requested training commensurate with those risks, including attendance at the FBI Hazardous Devices School.

51. Plaintiff is informed and believes, and thereon alleges, that Detective Lemus's safety complaints and training requests were received by DOE supervisors and policymakers, who ignored them, inadequately addressed them, and/or treated them as further grounds for disfavor. Rather than promptly training Detective Lemus or relieving him of duties he was not qualified to perform, the Department kept him in the hazardous assignment and scheduled him to attend the Hazardous Devices School in October 2025, months away, while requiring him in the interim to perform bomb-squad duties with nothing but "on the job" training.

52. Plaintiff is informed and believes, and thereon alleges, that the Department variously represented that Detective Lemus would attend the FBI Hazardous Devices School in October 2025, in January 2026, or in the summer of 2026, approximately two years after his assignment to the Detail. On any version of the schedule, the Department required Detective Lemus to perform bomb

squad duties for many months before providing him the only formal training available anywhere in the country, and he was killed before ever receiving it.

53. Accordingly, as of July 18, 2025, Detective Lemus: (a) had never attended the FBI Hazardous Devices School; (b) held no bomb-technician certification of any kind; (c) had received no formal explosives training from the Department; and (d) was performing bomb-squad duties under the supervision of a Detail that had no written procedures, obsolete protective suits, twenty-year-old X-ray equipment, and cement gutters in lieu of a disposal facility.

**D. July 17, 2025: The Santa Monica Grenades and the False-Negative X-Ray**

54. On or about July 17, 2025, LASD personnel responded to a call for service at an apartment building in Santa Monica, California, where civilians had discovered two military hand grenades. Deputies retrieved the grenades.

55. Plaintiff is informed and believes, and thereon alleges, that the grenades were examined using one of the Department's antiquated, approximately twenty-year-old X-ray devices, an unreliable unit deployed from a Department work truck rather than from a properly equipped bomb-response vehicle, and that the device produced a false-negative image leading personnel to conclude, erroneously, that the grenades were inert.

56. Plaintiff is informed and believes, and thereon alleges, that in reliance on that erroneous determination, and in the absence of any written Departmental explosives-handling, transport, or custody procedures, the grenades were transported on busy public streets, were kept overnight in a location not designed or approved for the storage of live ordnance, and were then driven to the SEB facility at the Biscailuz Center the following morning, all without the containment, storage, and chain-of-custody safeguards that any minimally funded, trained, and equipped bomb squad would have employed.

**E. July 18, 2025: A Music Video, Then a Detonation**

57. On information and belief, on the morning of July 18, 2025, Detective Lemus, Detective Kelley-Eklund, and Detective Osborn were directed to report to the SEB facility early in order to participate in and support the filming of a music video for a country-music artist at the SEB facility. The Department, which for a decade could not find funds to train or equip its bomb squad,

made its personnel and its facility available for a promotional entertainment production.

58. Following the video shoot, the detectives turned to the grenades recovered the previous day. At approximately 7:30 a.m., while the grenades, believed inert on the strength of the false-negative X-ray, were being handled in the SEB parking lot, one of the grenades detonated.

59. Plaintiff is informed and believes, and thereon alleges, that Detectives Kelley-Eklund and Osborn, having failed to determine that the device was live, used the grenade as a training tool and demonstration for Detective Lemus, who lacked any formal training and was wholly reliant upon the expertise of the colleagues to whom the Department had assigned him, and that in the course of that demonstration the pin of the grenade was pulled and the device detonated.

60. Detective Lemus knew that Detectives Kelley-Eklund and Osborn had responded to the Santa Monica call the previous day and reasonably presumed that they had taken all steps necessary to ensure that the device was inert. He reasonably expected that his colleagues would not have transported a live explosive device on public roadways while improperly stored, maintained a live explosive device overnight at a private residence, or brought a live explosive device onto the grounds of the Biscailuz Regional Training Center, and he reasonably understood that, because he had not yet been trained, he was not to be exposed to a live explosive device at all.

61. The explosion killed Detective Victor Lemus, Detective Joshua Kelley-Eklund, and Detective William Osborn. The Los Angeles County Department of Medical Examiner determined that all three died of multiple blast injuries. In the immediate aftermath, the second grenade could not be located or accounted for.

62. Investigators from the Los Angeles Police Department and the federal Bureau of Alcohol, Tobacco, Firearms and Explosives responded to the scene to investigate.

63. Detective Lemus was survived by his wife and three daughters, including Plaintiff. He died seventeen days after the twenty-second anniversary of his service to the Department. His funeral, held August 12, 2025, was the last of the three funerals occasioned by the Department's choices.

**F. The Aftermath: Willful Cal/OSHA Violations and Obstruction**

64. On July 21, 2025, Cal/OSHA opened a fatality investigation (Inspection No.

1839399.015) pursuant to Labor Code section 6313.

65. The Entity Defendants obstructed that investigation at every turn. Among other things: (a) in response to Cal/OSHA's November 21, 2025 document request, LASD produced an "Immediate Response" document describing the retrieval of the grenades that was redacted in its entirety except for two lines; (b) LASD failed to produce its explosives-handling procedures, because, as Lieutenant Auner admitted, none exist; (c) LASD failed to produce the NABSC guidelines it claimed to follow; and (d) after Cal/OSHA served an administrative subpoena duces tecum on December 23, 2025 seeking nineteen categories of documents, LASD produced documents responsive to only two categories, forcing the Division of Occupational Safety and Health to file a Petition to Compel Compliance in this Court on January 15, 2026 (Case No. 26STCP00201).

66. On January 16, 2026, Cal/OSHA issued eight citations to LASD arising out of the fatal explosion, with proposed penalties totaling $351,000, including: two WILLFUL violations of title 8, California Code of Regulations, section 3203, subdivisions (a)(6) and (a)(7), the Injury and Illness Prevention Program requirements to correct unsafe and unhealthy conditions and work practices and to provide training and instruction, each carrying a $125,000 penalty; four SERIOUS violations, including of sections 3203(a)(4) (failure to identify and evaluate workplace hazards), 3380(f)(1) (personal protective equipment), 5251(m) (explosives), and 5268(a); and two additional violations of sections 3203(b)(2) and 3380(f)(2). LASD has contested the citations rather than abate the conditions.

67. The conditions cited by Cal/OSHA included failures to correct unsafe work conditions and practices; inadequate training and instruction of the deputies who handled the grenades; failure to ensure that employees used appropriate personal protective equipment when handling explosive ordnance; failure to establish and maintain effective methods to identify and evaluate hazards related to retrieving, transporting, storing, and handling explosive ordnance; leaving explosive materials unattended and not stored in required magazines; failure to place explosive materials in suitable containers when transported manually; failure to maintain required documentation of safety training; and failure to complete and certify a written workplace hazard assessment for personal

protective equipment.

68. The willful citations confirm what Detective Lemus complained of before he died, and what retired Deputy Digby warned Department leadership in writing before the explosion: the Department knew its bomb squad was untrained and under-equipped, knew the conditions were dangerous, and refused to fix them.

### G. The Death Images: Commander Giandomenico Photographs and Shares Images of Detective Lemus's Remains

69. Plaintiff is informed and believes, and thereon alleges, that on July 18, 2025, Commander Thomas Giandomenico responded to the Biscailuz Center in the aftermath of the explosion and, using his personal cell phone, took multiple unauthorized, unofficial, and non-investigative photographs of the remains of Detective Lemus and his fallen colleagues, remarking as he did so, "This is going to be a good picture." A witness cautioned Giandomenico to show respect for the dead. Undeterred, Giandomenico took the photographs, kept them, and later shared them with others for no law enforcement purpose whatsoever. On March 26, 2026, the Los Angeles Times publicly reported this conduct.

70. The County, LASD, and Sheriff Luna have long been on express notice of Department personnel's custom of taking gratuitous death images. In September 2020, Vanessa Bryant sued the County and LASD after Department personnel photographed the remains of her husband and daughter for personal use (Bryant v. County of Los Angeles, Los Angeles Superior Court Case No. 20STCV35884), litigation that documented the longstanding custom, the absence of any formal policy or training, and the Department's deliberate indifference to the privacy rights of decedents' families. In direct response, the Legislature enacted Penal Code section 647.9, the "Kobe Bryant Act," which prohibits a first responder from capturing images of a deceased person for any purpose other than an official law enforcement purpose, and LASD thereafter adopted a formal policy prohibiting such photographs.

71. While campaigning for Sheriff in 2022, Robert Luna publicly declared that the taking of such photographs by LASD personnel was "not acceptable under any circumstances" and demanded that the culpable parties be held accountable. Yet, on information and belief, Luna

promoted Giandomenico to command rank; failed to implement any adequate training or supervision of personnel, including command staff, regarding Penal Code section 647.9 and the Department's own policy; and, upon learning that Giandomenico had taken the photographs, failed to confiscate his cell phone or to determine to whom the images had been sent, thereby permitting their continued storage and circulation, and the Department attempted to conceal the existence of the photographs from Decedent's family.

72. That a command level official, entrusted with enforcing the Department's own post-Bryant policy and with disciplining subordinates who violate it, openly photographed the remains of the Department's own fallen detectives at a highly publicized scene, and then kept and shared those images, demonstrates that the formal policy is a dead letter and that the unlawful custom persists with the knowledge and ratification of the Department's highest policymakers.

73. Plaintiff, as Decedent's daughter, has a constitutionally and legally protected interest in the remains, memory, and death images of her father, and in honoring and mourning him. The knowledge that images of her father's remains were taken, kept, and shared for the gratification of others, and may surface at any moment on the internet or on social media, where they may be stored and transmitted indefinitely, has caused and will continue to cause Plaintiff severe emotional distress.

## INAPPLICABILITY OF WORKERS' COMPENSATION EXCLUSIVITY

74. Plaintiff's claims are not barred by the exclusivity provisions of the Workers' Compensation Act (Lab. Code §§ 3600, 3602). Without limitation:

75. **Fraudulent concealment (Lab. Code § 3602(b)(2)).** As alleged herein, Defendants fraudulently concealed from Detective Lemus the existence and true magnitude of the hazards to which he was exposed, including the unreliability of the Department's X-ray equipment, the absence of any written handling procedures, the obsolescence of its protective equipment, and the true, live condition of the ordnance he was directed to handle, and concealed the connection between those hazards and the injuries that killed him, thereby aggravating the harm.

76. **Federal civil rights claims.** Plaintiff's claims under 42 U.S.C. section 1983 arise under federal law and are not subject to workers' compensation preclusion under the Supremacy Clause.

77. **Willful and deliberate conduct; dual capacity.** In addition and in the alternative, Defendants' conduct, including the deliberate indifference of DOE Defendants to known, documented, and reported safety risks after warnings, falls within the exceptions recognized by Labor Code section 3602(b), and Defendants acted in capacities beyond that of employer, including as the owner and operator of a dangerous public facility and as policymakers and regulatory actors (the dual-capacity doctrine).

**FIRST CAUSE OF ACTION**

**WRONGFUL DEATH: NEGLIGENCE**

**(Code Civ. Proc. § 377.60; Gov. Code §§ 815.2, 820, 835, 835.2)**

**(By Plaintiff Individually, Against the Entity Defendants and DOES 1 through 50)**

78. Plaintiff realleges and incorporates by reference paragraphs 1 through 77, inclusive, as though fully set forth herein.

79. At all relevant times, Defendants, and each of them, owed Detective Lemus a duty to exercise reasonable care in, among other things: the assignment of personnel to hazardous duties; the provision of training, certification, supervision, equipment, facilities, and written procedures adequate to the known hazards of explosives work; the inspection, maintenance, and replacement of diagnostic and protective equipment; the safe examination, transport, storage, and handling of suspected explosive devices; and the correction of known unsafe conditions and practices.

80. Pursuant to Government Code section 815.2, subdivision (a), the Entity Defendants are liable for injury proximately caused by the acts and omissions of their employees, including DOES 1 through 50, within the scope of their employment. Pursuant to Government Code section 820, each DOE Defendant is liable for his or her own negligent acts and omissions to the same extent as a private person. The duties alleged herein are further imposed by statute and regulation, including Labor Code sections 6400 through 6404 and title 8 of the California Code of Regulations, including sections 3203, 3380, 5251, and 5268, the violation of which constitutes negligence per se (Evid. Code § 669).

81. Defendants breached those duties. Among other things, Defendants: (a) involuntarily assigned an untrained, uncertified deputy to a bomb squad; (b) failed and refused to provide formal

explosives training before requiring him to perform bomb-squad duties, providing only unstructured "on the job" training; (c) failed to send him to the FBI Hazardous Devices School before exposing him to live ordnance; (d) maintained no written explosives-handling, transport, storage, or custody procedures; (e) equipped the Detail with obsolete protective suits approximately two generations out of date and unreliable X-ray devices approximately twenty years old; (f) provided no bomb laboratory or proper disposal facility, relegating technicians to cement gutters; (g) permitted the July 17, 2025 grenades to be examined with an unreliable X-ray unit deployed from a work truck, transported on public streets, and stored overnight without appropriate safeguards; (h) permitted and/or directed untrained personnel, including Detective Lemus, to handle the grenades on July 18, 2025; (i) ignored Detective Lemus's safety complaints and training requests; (j) disregarded the pre-explosion written warnings of veteran personnel, including retired Deputy Mike Digby that the bomb squad was dangerously undertrained and that someone would be killed; (k) permitted scheduled bomb squad training to be skipped so that personnel could staff protection details for the Board of Supervisors; and (l) failed to correct unsafe conditions and practices of which they had actual notice, as later confirmed by Cal/OSHA's willful citations.

82. Further, and as an additional and independent basis of liability against the Entity Defendants pursuant to Government Code sections 835 and 835.2, at all relevant times the Entity Defendants owned, operated, controlled, and maintained the SEB facility at the Eugene W. Biscailuz Regional Training Center, including its parking lot, its cement gutters used for explosives examination and disposal operations, and the equipment appurtenant thereto, including the Department's X-ray devices, protective suits, and explosives storage and transport apparatus.

83. The property was in a dangerous condition within the meaning of Government Code section 830 in that, among other things, it lacked any laboratory, containment structure, or engineered facility for the examination, render-safe processing, storage, or disposal of explosive ordnance; suspected ordnance was examined and handled in an open parking lot and cement gutters in proximity to personnel; and the diagnostic and protective equipment maintained as part of and appurtenant to the facility was obsolete and unreliable. These conditions created a substantial risk of injury when the property was used with due care in a manner reasonably foreseeable, including

the foreseeable examination and handling of ordnance believed, on the strength of the facility's own defective equipment, to be inert.

84. The dangerous condition proximately caused Decedent's fatal injuries on July 18, 2025, and the injury was of a kind the risk of which was created by the condition.

85. The Entity Defendants had actual notice of the dangerous condition pursuant to Government Code section 835.2, including through Decedent's own complaints and the pre-explosion written warnings of veteran personnel, including retired Deputy Mike Digby, and/or constructive notice, in that the condition had existed for years, since the 2015 consolidation, and was of such an obvious character that the Entity Defendants, in the exercise of due care, should have discovered it and remedied it; alternatively, the condition was created by the negligent and wrongful acts and omissions of Defendants' employees acting within the scope of their employment (Gov. Code § 835, subd. (a)).

86. As a direct, legal, and proximate result of Defendants' breaches, the grenade detonated on July 18, 2025, killing Detective Lemus. Defendants' acts and omissions were a substantial factor in causing his death.

87. As a direct, legal, and proximate result of Decedent's wrongful death, Plaintiff has sustained and will sustain economic damages, including the loss of financial support, gifts, benefits, and household services Decedent would have provided, and funeral and burial expenses, and non-economic damages, including the loss of Decedent's love, companionship, comfort, care, assistance, protection, affection, society, moral support, training, and guidance, all in amounts to be proven at trial.

## SECOND CAUSE OF ACTION

## VIOLATION OF CIVIL RIGHTS: DEPRIVATION OF FAMILIAL RELATIONSHIP AND FAMILY INTEGRITY

**(42 U.S.C. § 1983; Fourteenth Amendment; Monell)**

**(By Plaintiff Individually, Against Defendants Luna, Giandomenico, the County, and DOES 1 through 50)**

88. Plaintiff realleges and incorporates by reference paragraphs 1 through 87, inclusive, as

though fully set forth herein.

89. At all relevant times, Defendants Luna, Giandomenico, and DOES 1 through 50 acted under color of state law in their capacities as the Sheriff, a Commander, and supervisors, commanders, and policymakers, respectively, of the County and the LASD.

90. The Fourteenth Amendment to the United States Constitution protects the intrafamilial relationship. A child possesses a constitutionally protected liberty interest in the companionship and society of her parent, and official conduct that shocks the conscience in depriving her of that interest is actionable under 42 U.S.C. section 1983. (Curnow v. Ridgecrest Police (9th Cir. 1991) 952 F.2d 321, 325; Wilkinson v. Torres (9th Cir. 2010) 610 F.3d 546, 554.) The Fourteenth Amendment likewise protects the right to privacy and family integrity, including a family member's right to control the physical remains, memory, and death images of a deceased parent, and the exploitation of a decedent's death images by government officials shocks the conscience. (Marsh v. County of San Diego (9th Cir. 2012) 680 F.3d 1148, 1154.)

91. Deprivation of the familial relationship by state created danger. Defendant Luna and DOE command staff, through the affirmative acts and omissions alleged herein, stripped Detective Lemus of his K-9 SWAT position on pretext; involuntarily assigned him, untrained and uncertified, to bomb squad duties; denied his documented requests for training; required him to work with obsolete and unreliable equipment, without written procedures, under inexperienced colleagues and unfit supervisors; and directed or permitted him to be placed in the immediate presence of ordnance that had not reliably been rendered safe, all with deliberate indifference to a known and obvious risk of death. That conduct shocks the conscience and proximately caused Decedent's death on July 18, 2025, thereby depriving Plaintiff of her Fourteenth Amendment liberty interest in the intrafamilial relationship, and in the companionship and society, of her father.

92. Deprivation of family integrity and privacy in death images. Defendant Giandomenico's taking, retention, and sharing of unauthorized, non-investigative photographs of Decedent's remains, for no law enforcement purpose and in violation of Penal Code section 647.9 and the Department's own policy, and Defendant Luna's ratification of and failure to remediate that conduct, including his failure to confiscate the cell phone or to trace and contain the dissemination of the images, deprived

Plaintiff of her constitutionally protected rights to privacy and family integrity and to control the remains, memory, and death images of her father.

93. Monell liability of the County. The deprivations alleged herein were caused by the official policies, customs, and practices of the County, including: (a) the decade long policy of defunding the Arson/Explosives Detail, the custom of assigning untrained personnel to bomb squad duties, and a failure to train amounting to deliberate indifference to the rights of persons, where the need for training was obvious and the inadequacy so likely to result in death that policymakers can reasonably be said to have been deliberately indifferent (City of Canton v. Harris (1989) 489 U.S. 378); and (b) the longstanding, well documented custom and practice of LASD personnel taking and sharing unauthorized photographs of decedents at death scenes, of which the County and Sheriff Luna had express notice since at least September 2020 through the Bryant litigation, and which persisted notwithstanding the enactment of Penal Code section 647.9 and the adoption of a formal policy that command staff, including Giandomenico, treated as a dead letter. Sheriff Luna, a final policymaker whose edicts and acts represent official County policy, ratified the foregoing, including by promoting Giandomenico, failing to discipline him, and failing to confiscate his cell phone or contain the dissemination of the images after learning of them.

94. As a direct and proximate result of these constitutional violations, Plaintiff has been deprived of the companionship and society of her father and has suffered, and will continue to suffer, severe emotional distress, including the continuing and reasonable fear that the death images of her father will circulate indefinitely on the internet and on social media, all in amounts to be proven at trial.

95. The conduct of Defendants Luna and Giandomenico and DOES 1 through 50 was malicious, oppressive, and undertaken with reckless or callous indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages against those Defendants in their individual capacities (and not against the County), together with attorneys' fees and costs pursuant to 42 U.S.C. section 1988.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1. For wrongful death damages, economic and non-economic, according to proof;

2. For funeral and burial expenses, according to proof;

3. For punitive and exemplary damages against Defendants Luna and Giandomenico and DOES 1 through 50, in their individual capacities only, pursuant to 42 U.S.C. section 1983 and Civil Code section 3294, according to proof;

4. For attorneys' fees as authorized by law, including 42 U.S.C. section 1988 and Code of Civil Procedure section 1021.5;

5. For prejudgment and post-judgment interest as permitted by law;

6. For costs of suit incurred herein; and

7. For such other and further relief as the Court deems just and proper.

**Date: July 16, 2026**

**TORRES | SIEGRIST**

**By:** ______________________

**DAVID G. TORRES-SIEGRIST**
**Attorneys for Plaintiff**

**DEMAND FOR JURY TRIAL**

Additionally, plaintiff respectfully demands a jury trial of the present case pursuant to the U.S. Constitution, the California Constitution and applicable California State and Federal Law.

**Date: July 16, 2026**

**TORRES | SIEGRIST**

By:________________________
**DAVID G. TORRES-SIEGRIST**
**Attorneys for Plaintiff**

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | FILED<br>Superior Court of California<br>County of Los Angeles<br>07/16/2026<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: S. Ruiz Deputy |
| NOTICE OF CASE ASSIGNMENT<br>UNLIMITED CIVIL CASE | |
| Your case is assigned for all purposes to the judicial officer indicated below. | CASE NUMBER:<br>26STCV22430 |

**THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT**

| | ASSIGNED JUDGE | DEPT | ROOM | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|
| ✓ | William F. Fahey | 621 | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record David W. Slayton, Executive Officer / Clerk of Court

on 07/17/2026 (Date) By S. Ruiz, Deputy Clerk

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

**APPLICATION**
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

**PRIORITY OVER OTHER RULES**
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

**CHALLENGE TO ASSIGNED JUDGE**
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

**TIME STANDARDS**
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

**COMPLAINTS**
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

**CROSS-COMPLAINTS**
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

**STATUS CONFERENCE**
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

**FINAL STATUS CONFERENCE**
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

**SANCTIONS**
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

**Class Actions**
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

***Provisionally Complex Cases**
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

*Superior Court of California, County of Los Angeles*

**ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE**

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS MUST SERVE THIS ADR INFORMATION PACKAGE ON ANY NEW PARTIES NAMED TO THE ACTION WITH THE CROSS-COMPLAINT.**

**WHAT IS ADR?**

Alternative Dispute Resolution (ADR) helps people find solutions to their legal disputes without going to trial. The Court offers a variety of ADR resources and programs for various case types.

**TYPES OF ADR**

- **Negotiation.** Parties may talk with each other about resolving their case at any time. If the parties have attorneys, they will negotiate for their clients.

- **Mediation.** Mediation may be appropriate for parties who want to work out a solution but need help from a neutral third party. A mediator can help the parties reach a mutually acceptable resolution. Mediation may be appropriate when the parties have communication problems and/or strong emotions that interfere with resolution. Mediation may not be appropriate when the parties want a public trial, lack equal bargaining power, or have a history of physical or emotional abuse.

- **Arbitration.** Less formal than a trial, parties present evidence and arguments to an arbitrator who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision.

- **Settlement Conferences.** A judge or qualified settlement officer assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Mandatory settlement conferences may be ordered by a judicial officer. In some cases, voluntary settlement conferences may be requested by the parties.

**ADVANTAGES OF ADR**

- **Save time and money.** Utilizing ADR methods is often faster than going to trial and parties can save on court costs, attorney's fees, and other charges.
- **Reduce stress and protect privacy.** ADR is conducted outside of a courtroom setting and does not involve a public trial.
- **Help parties maintain control.** For many types of ADR, parties may choose their ADR process and provider.

**DISADVANTAGES OF ADR**

- **Costs.** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial.** ADR does not provide a public trial or decision by a judge or jury.

**WEBSITE RESOURCES FOR ADR**

- **Los Angeles Superior Court ADR website:** www.lacourt.org/ADR
- **California Courts ADR website:** www.courts.ca.gov/programs-adr.htm

**Los Angeles Superior Court ADR Programs for Unlimited Civil (cases valued over $35,000)**
Litigants should closely review the requirements for each program and the types of cases served.

- **Civil Mediation Vendor Resource List.** Litigants in unlimited civil cases may use the Civil Mediation Vendor Resource List to arrange voluntary mediations without Court referral or involvement. The Resource List includes organizations that have been selected through a formal process that have agreed to provide a limited number of low-cost or no-cost mediation sessions with attorney mediators or retired judges. Organizations may accept or decline cases at their discretion. Mediations are scheduled directly with these organizations and are most often conducted through videoconferencing. The organizations on the Resource List target active civil cases valued between $50,000-$250,000, though cases outside this range may be considered. *For more information and to view the list of vendors and their contact information, download the Resource List Flyer and FAQ Sheet at www.lacourt.org/ADR/programs.html.*
  **RESOURCE LIST DISCLAIMER:** The Court provides this list as a public service. The Court does not endorse, recommend, or make any warranty as to the qualifications or competency of any provider on this list. Inclusion on this list is based on the representations of the provider. The Court assumes no responsibility or liability of any kind for any act or omission of any provider on this list.

- **Mediation Volunteer Panel (MVP).** Unlimited civil cases referred by judicial officers to the Court's Mediation Volunteer Panel (MVP) are eligible for three hours of virtual mediation at no cost with a qualified mediator from the MVP. Through this program, mediators volunteer preparation time and three hours of mediation at no charge. If the parties agree to continue the mediation after three hours, the mediator may charge their market hourly rate. When a case is referred to the MVP, the Court's ADR Office will provide information and instructions to the parties. The Notice directs parties to meet and confer to select a mediator from the MVP or they may request that the ADR Office assign them a mediator. The assigned MVP mediator will coordinate the mediation with the parties. *For more information or to view MVP mediator profiles, visit the Court's ADR webpage at www.lacourt.org/ADR or email ADRCivil@lacourt.org.*

- **Mediation Center of Los Angeles (MCLA) Referral Program.** The Court may refer unlimited civil cases to mediation through a formal contract with the Mediation Center of Los Angeles (MCLA), a nonprofit organization that manages a panel of highly qualified mediators. Cases must be referred by a judicial officer or the Court's ADR Office. The Court's ADR Office will provide the parties with information for submitting the case intake form for this program. MCLA will assign a mediator based on the type of case presented and the availability of the mediator to complete the mediation in an appropriate time frame. MCLA has a designated fee schedule for this program. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*

- **Resolve Law LA (RLLA) Virtual Mandatory Settlement Conferences (MSC).** Resolve Law LA provides three-hour virtual Mandatory Settlement Conferences at no cost for personal injury and non-complex employment cases. Cases must be ordered into the program by a judge pursuant to applicable Standing Orders issued by the Court and must complete the program's online registration process. The program leverages the talent of attorney mediators with at least 10 years of litigation experience who volunteer as settlement officers. Each MSC includes two settlement officers, one each from the plaintiff and defense bars. Resolve Law LA is a joint effort of the Court, Consumer Attorneys Association of Los Angeles County (CAALA), Association of Southern California Defense Counsel (ASCDC), Los Angeles Chapter of the American Board of Trial Advocates (LA-ABOTA), Beverly Hills Bar Foundation (BHBF), California Employment Lawyers Association (CELA), and Los Angeles County Bar Association (LACBA). *For more information, visit https://resolvelawla.com.*

- **Judicial Mandatory Settlement Conferences (MSCs).** Judicial MSCs are ordered by the Court for unlimited civil cases and may be held close to the trial date or on the day of trial. The parties and their attorneys meet with a judicial officer who does not make a decision, but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For more information, visit https://www.lacourt.org/division/civil/CI0047.aspx.

**Los Angeles Superior Court ADR Programs for Limited Civil (cases valued below $35,000)**
Litigants should closely review the requirements for each program and the types of cases served.

- **Dispute Resolution Program Act (DRPA) Day-of-Hearing Mediation.** Through the Dispute Resolution Program Act (DRPA), the Court works with county-funded agencies, including the Los Angeles County Department of Consumer & Business Affairs (DCBA) and the Center for Conflict Resolution (CCR), to provide voluntary day-of-hearing mediation services for small claims, unlawful detainer, limited civil, and civil harassment matters. DCBA and CCR staff and trained volunteers serve as mediators, primarily for self-represented litigants. There is no charge to litigants. *For more information, visit https://dcba.lacounty.gov/countywidedrp.*

- **Temporary Judge Unlawful Detainer Mandatory Settlement Conference Pilot Program.** Temporary judges who have been trained as settlement officers are deployed by the Court to designated unlawful detainer court locations one day each week to facilitate settlement of unlawful detainer cases on the day of trial. For this program, cases may be ordered to participate in a Mandatory Settlement Conference (MSC) by judicial officers at Stanley Mosk, Long Beach, Compton, or Santa Monica. Settlement rooms and forms are available for use on the designated day at each courthouse location. There is no charge to litigants for the MSC. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*