DAVID G. TORRES-SIEGRIST State Bar No. 220187
TORRES | SIEGRIST LAW APC
440 E. Huntington Dr.
Suite 300
Arcadia, CA 91006
626-277-5330
dgts@dgtslaw.com

**Attorneys for Plaintiff** ALEXIS LEMUS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXIS LEMUS, an individual,<br>Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES, a public entity; LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, a public entity; ROBERT LUNA, individually and in his official capacity as Sheriff of Los Angeles County; THOMAS GIANDOMENICO, individually and in his official capacity as a Commander of the Los Angeles County Sheriff's Department; and DOES 1 through 50, inclusive,<br>Defendants. | Case No.: 2:26-cv-09259-JAK-MAR<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS [DKT. 6]; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**Hearing:**<br>**Date: November 2, 2026,**<br>**Time: 8:30 a.m.**<br>**Place: Felicitas and Gonzalo Mendez United States Courthouse, Los Angeles Courtroom 10C, 10th Floor**<br><br>Hon. John A. Kronstadt<br>U.S. District Court Judge<br><br>Complaint Filed: July 16, 2026<br>Date of Removal: August 19, 2026 |

**COMES NOW,** Plaintiff ALEXIS LEMUS, who submits the following

Memorandum of Points and Authorities in Opposition to **the Motion to Dismiss (Dkt. 6) filed by Defendants County of Los Angeles, Los Angeles County Sheriff's Department, and Robert Luna.**

**Date: September 3, 2026**

**TORRES | SIEGRIST**

**By:_____________________________**
**DAVID G. TORRES-SIEGRIST**
**Attorneys for Plaintiff ALEXIS LEMUS**

TORRES | SIEGRIST

TORRES | SIEGRIST

# TABLE OF CONTENTS

**I. INTRODUCTION** .......... 1
**II. FACTUAL BACKGROUND** .......... 2
**III. LEGAL STANDARD** .......... 4
**IV. ARGUMENT** .......... 5
A. The Wrongful Death Claim Is Not Barred by Workers' Compensation Exclusivity at the Pleading Stage. .......... 5
1. The Complaint Adequately Pleads Fraudulent Concealment Under Labor Code Section 3602(b)(2). .......... 5
2. The Fermino Exception and the Dual Capacity Doctrine Present Questions That Cannot Be Resolved on the Pleadings; at Minimum, Amendment Is Proper. .......... 7
3. Exclusivity Does Not Touch the Federal Claims. .......... 8
B. The Complaint States Claims Under Section 1983. .......... 8
1. The Complaint Pleads Deliberate Indifference and Affirmative Conduct, Not "Mere Negligence." .......... 8
2. The State Created Danger Doctrine Applies .......... 8
3. The Complaint States a Monell Claim. .......... 11
4. Plaintiff's Familial Association Claim Rests on Binding Ninth Circuit Precedent That This Court Must Follow. .......... 14
5. Qualified Immunity Cannot Be Resolved on This Record, and in Any Event the Rights Were Clearly Established. .......... 15
C. At Minimum, Leave to Amend Must Be Granted. .......... 16
**V. CONCLUSION** .......... 17

TORRES | SIEGRIST

# TABLE OF AUTHORITIES

## CASES

*Arriaga v. County of Alameda*, 9 Cal. 4th 1055 (1995) .......... 5
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).......... 4
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).......... 5
*Chambers v. Sanders*, 63 F.4th 1092 (6th Cir. 2023).......... 15
*City of Canton v. Harris*, 489 U.S. 378 (1989) .......... 12
*Collins v. City of Harker Heights*, 503 U.S. 115 (1992) .......... 9
*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) .......... 8
*Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991).......... 14, 16
*Daniels v. Williams*, 474 U.S. 327 (1986).......... 8
*Dodge v. Evergreen Sch. Dist. No. 114*, 56 F.4th 767 (9th Cir. 2022) .......... 13
*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003) .......... 16
*Estate of Hernandez v. City of Los Angeles*, 139 F.4th 790 (9th Cir. 2025) (en banc), *cert. denied*, No. 25-538 (U.S. June 22, 2026).......... 14
*Estate of Hernandez v. City of Los Angeles*, 96 F.4th 1209 (9th Cir. 2024).......... 14
*Fermino v. Fedco, Inc.*, 7 Cal. 4th 701 (1994) .......... 7, 8
*Foster v. Xerox Corp.*, 40 Cal. 3d 306 (1985).......... 5, 6
*Garcia v. Benov*, 715 F. Supp. 2d 974 (C.D. Cal. 2009).......... 14
*Herrera v. L.A. Unified Sch. Dist.*, No. SACV-17-00069-JVS-KESx, 2018 U.S. Dist. LEXIS 217001, 2018 WL 3816741 (C.D. Cal. July 3, 2018), *aff'd*, 18 F.4th 1156 (9th Cir. 2021) .......... 11
*Johns-Manville Prods. Corp. v. Superior Court*, 27 Cal. 3d 465 (1980).......... 5, 6
*Jones v. Bock*, 549 U.S. 199 (2007).......... 5
*Keates v. Koile*, 883 F.3d 1228 (9th Cir. 2018).......... 15
*Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006).......... 8, 10
*Kisela v. Hughes*, 584 U.S. 100 (2018) (per curiam) .......... 16
*Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991).......... 13

*Lazo v. Mobil Oil Refining Corp.*, No. CV-14-1072-ABC-JCx, 2014 U.S. Dist. LEXIS 195036, 2014 WL 12596424 (C.D. Cal. May 30, 2014) ... 6

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) ... 4

*Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062 (9th Cir. 2013) ... 14, 15

*Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000) (en banc) ... 5, 16

*L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992) ... 9, 10, 15

*L.W. v. Grubbs*, 92 F.3d 894 (9th Cir. 1996) ... 11

*Marsh v. County of San Diego*, 680 F.3d 1148 (9th Cir. 2012) ... 11, 15, 16

*Martinez v. City of Clovis*, 943 F.3d 1260 (9th Cir. 2019) ... 8

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc) ... 14

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ... 2, 11, 12, 13

*Navarro v. Block*, 72 F.3d 712 (9th Cir. 1995) ... 12

*O'Brien v. Welty*, 818 F.3d 920 (9th Cir. 2016) ... 15

*Patel v. Kent Sch. Dist.*, 648 F.3d 965 (9th Cir. 2011) ... 11

*Pauluk v. Savage*, 836 F.3d 1117 (9th Cir. 2016) ... 9, 10, 15

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ... 12

*Polanco v. Diaz*, 76 F.4th 918 (9th Cir. 2023) ... passim

*Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008) ... 8, 14, 15

*Scovill v. Siemens Mobility, Inc.*, No. 2:25-cv-01081-TLN-SCR, 2026 U.S. Dist. LEXIS 172327, 2026 WL 2225720 (E.D. Cal. Aug. 3, 2026) ... 7

*Sinclair v. City of Seattle*, 61 F.4th 674 (9th Cir. 2023) ... 10

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) ... 16

*Trevino v. Gates*, 99 F.3d 911 (9th Cir. 1996) ... 12

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ... 14

*Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010) ... 14, 15

## STATUTES

42 U.S.C. § 1983 ... 8, 14

Cal. Lab. Code § 3602(b)(2) ... 5



TORRES | SIEGRIST

Cal. Penal Code § 647.9 .......... 4

**RULES**

Fed. R. Civ. P. 12(b)(6) .......... 1, 4, 6
Fed. R. Civ. P. 15(a)(2) .......... 16

TORRES | SIEGRIST

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendants ask this Court to hold, at the pleading stage and with prejudice, that nothing in the Constitution or the laws of California offers any remedy for the deadliest single day in the Sheriff's Department's modern history. The Complaint alleges, in extensive and particularized detail, that the County and LASD spent a decade deliberately defunding their bomb squad; that veteran personnel warned command staff in writing that the unit was so undertrained that "someone would be killed" (Complaint, Dkt. 1, Ex. 1, ¶¶ 34-36; unless otherwise noted, all "¶" citations are to the Complaint); that the Department nonetheless involuntarily transferred Detective Victor Lemus, a man with no explosives training whatsoever, into that unit as retaliatory punishment (¶¶ 45-47); that the Department's own policy prohibited untrained personnel from being in the immediate presence of live explosive devices (¶ 48); that Defendants nevertheless pronounced two military hand grenades "inert" on the strength of a twenty year old X-ray device they knew to be unreliable, transported them over public streets, and brought them to the very facility where Detective Lemus was directed to report the next morning (¶¶ 54-58); and that Defendants directed or permitted untrained personnel, including Detective Lemus, to handle those grenades, which were used as a training demonstration "for Detective Lemus" when one detonated and killed him and two colleagues (¶¶ 58-61, 81(h)). Cal/OSHA has since issued two willful citations against the Department for failure to correct known unsafe conditions and failure to train. (¶ 66.)

The Motion proceeds by recharacterizing these allegations as garden variety negligence and then attacking the recharacterization. But on a Rule 12(b)(6) motion the Complaint's factual allegations, not Defendants' paraphrase of them, control, and all reasonable inferences run in Plaintiff's favor. So read, the Complaint states a wrongful death claim within the fraudulent concealment exception to workers' compensation exclusivity, and states Fourteenth Amendment claims under the state

created danger doctrine, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and this Circuit's long settled familial association precedent, which the en banc Ninth Circuit left intact as recently as 2025. Sheriff Luna's request for qualified immunity fails at this stage under *Polanco v. Diaz*, 76 F.4th 918, 930-31 (9th Cir. 2023), which held that it has been clearly established in this Circuit for decades that a public employer may not, with deliberate indifference, affirmatively expose its employee to a known and foreseeable danger. The Motion should be denied. If the Court finds any pleading deficiency, leave to amend, not dismissal with prejudice, is the required course.

## II. FACTUAL BACKGROUND

**A decade of deliberate disinvestment.** In 2015 the Department consolidated its Arson/Explosives Detail ("AED") into the Special Enforcement Bureau ("SEB") to cut costs, and thereafter diverted funds historically earmarked for bomb squad training, equipment, and facilities to other SEB priorities. (¶¶ 24-26.) By July 18, 2025, the results included: no bomb laboratory or disposal facility (technicians used open cement gutters); protective suits two generations out of date; portable X-ray devices, "the single most important diagnostic step in determining whether a device is live or inert," that were approximately twenty years old, "unreliable, and prone to producing inadequate or misleading images"; no written explosives handling procedures of any kind; and no formal training for deputies before they completed the FBI's Hazardous Devices School ("HDS"), the only certifying school in the nation. (¶¶ 27-32.) Each deficiency "was longstanding, obvious, documented, and known to the Entity Defendants and DOE policymakers," who "elected, year after year, to allocate available funds elsewhere." (¶ 33.)

**Express written warnings.** Before the explosion, multiple veteran personnel emailed Department supervisors, including Under Sheriff Tardy and Commanders Giandomenico and Barragan, warning of the AED's training deficiencies. (¶¶ 34-35.) Deputy Michael Digby personally told the Detail's Captain that the unit was so undertrained "that someone would be killed." (¶ 36.) The Department also had years



TORRES | SIEGRIST

of documented notice that Commander Barragan, who supervised the Detail and traded its scheduled training away for protection details, was unfit for command. (¶¶ 38-42.)

**Detective Lemus's retaliatory transfer.** Detective Lemus was a decorated 22 year veteran who had earned one of the Department's most coveted assignments, K-9 handler with SEB's SWAT element. (¶¶ 43-44.) On June 2, 2024, command staff used third party litigation over a dog bite, in which Lemus committed no wrongdoing, as a pretext to strip him of that position for a crony and involuntarily "lateral" him into the bomb squad, for which he had no training, certification, or background. (¶¶ 45-47.) Under Department policy and practice, until he completed formal training Detective Lemus "was not to be in the immediate presence of live explosive devices." (¶ 48.) He objected, documented the dangers, repeatedly requested training, and was ignored; the Department scheduled him for HDS months in the future while requiring him to perform bomb squad duties in the interim with nothing but informal "on the job" training from a unit that had no written procedures to teach. (¶¶ 50-53.)

**The grenades.** On July 17, 2025, LASD personnel recovered two military hand grenades in Santa Monica. An antiquated X-ray unit, deployed from a work truck, produced a false negative image, and personnel erroneously pronounced the grenades inert. In the absence of any written handling, transport, or custody procedures, the grenades were driven over busy public streets, stored overnight in a location not designed for live ordnance, and brought to the SEB facility the next morning. (¶¶ 54-56.)

**July 18, 2025.** That morning, Detectives Lemus, Kelley-Eklund, and Osborn were directed to report early to the SEB facility to support the filming of a commercial music video. (¶ 57.) Afterward the detectives turned to the grenades, which, believed inert on the strength of the false negative X-ray, were "used ... as a training tool and demonstration for Detective Lemus," who lacked any formal training and was wholly reliant on the colleagues to whom the Department had





TORRES | SIEGRIST

TORRES | SIEGRIST

assigned him. The pin was pulled and the grenade detonated, killing all three men. (¶¶ 58-61.) The Complaint alleges that Defendants "permitted and/or directed untrained personnel, including Detective Lemus, to handle the grenades on July 18, 2025." (¶ 81(h).)

**The willful citations.** Cal/OSHA cited the Department for eight violations, including two willful violations for failure to correct known unsafe conditions and failure to train, assessing $351,000 in penalties, findings the Department met with obstruction so complete that the State was forced to petition to compel compliance with an administrative subpoena. (¶¶ 64-68.)

**The death images.** Commander Giandomenico, responding to the scene, used his personal phone to take unauthorized, non-investigative photographs of the remains of Detective Lemus and his colleagues, remarking "This is going to be a good picture," and "kept them, and later shared them with others for no law enforcement purpose whatsoever." (¶ 69.) The County and Sheriff Luna had express notice of the Department's custom of taking gratuitous death images since the 2020 *Bryant* litigation, which prompted the "Kobe *Bryant* Act," Cal. Penal Code § 647.9, and a formal LASD policy. (¶ 70.) Luna nonetheless promoted Giandomenico to command rank, failed to train or supervise command staff on the statute and policy, and, on learning of the photographs, failed to confiscate the phone or trace and contain the images' circulation, while the Department attempted to conceal the photographs' existence from the family. (¶¶ 71-72.)

## III. LEGAL STANDARD

A complaint survives Rule 12(b)(6) if it pleads "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). All factual allegations in the complaint "are taken as true and construed in the light most favorable to plaintiffs." *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001) (quotation omitted). Plausibility "is not akin to a 'probability requirement,'" *Iqbal*, 556 U.S. at 678; it

asks only for enough fact "to raise a reasonable expectation that discovery will reveal evidence" of the claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). An affirmative defense such as workers' compensation exclusivity supports dismissal only when "the allegations in the complaint suffice to establish that ground." *Jones v. Bock*, 549 U.S. 199, 215 (2007). And leave to amend must be granted "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quotation omitted).

## IV. ARGUMENT

### A. The Wrongful Death Claim Is Not Barred by Workers' Compensation Exclusivity at the Pleading Stage.

Exclusivity is an affirmative defense. Where, as here, a complaint pleads employment related injury, the plaintiff may proceed by pleading "additional facts that negate application of the exclusive remedy rule," *Arriaga v. County of Alameda*, 9 Cal. 4th 1055, 1060-61 (1995), which is precisely what the Complaint does. (¶¶ 74-77.) Whether those facts ultimately establish an exception presents factual questions not resolvable at the pleading stages.

#### 1. The Complaint Adequately Pleads Fraudulent Concealment Under Labor Code Section 3602(b)(2).

An employee (and in a death case, his heirs) may sue at law "[w]here the employee's injury is aggravated by the employer's fraudulent concealment of the existence of the injury and its connection with the employment." Cal. Lab. Code § 3602(b)(2). The exception codifies *Johns-Manville Prods. Corp. v. Superior Court*, 27 Cal. 3d 465, 477 (1980), and under *Foster v. Xerox Corp.*, 40 Cal. 3d 306, 312 (1985), general allegations that the employer knew of the work related injury, concealed that knowledge from the employee, and thereby aggravated the injury suffice at the pleading stage; the underlying details of what the employer knew and when are matters within the employer's possession and the proper subject of

discovery, not a pleading motion.

The Complaint alleges each element. Beginning no later than July 17, 2025, Detective Lemus was being subjected to an ongoing injurious exposure: he was placed, in violation of the Department's own policy (¶ 48), in the immediate presence of live military ordnance. Defendants knew the facts establishing that exposure: they knew the X-ray device that pronounced the grenades inert was twenty years old, unreliable, and prone to misleading images (¶¶ 30, 55); they knew no written procedures governed examination, transport, storage, or custody (¶¶ 31, 56); and they knew Detective Lemus was untrained and forbidden from being near live devices (¶¶ 48, 53). What Defendants told Detective Lemus was the opposite of what they knew: the grenades were represented as verified inert, and he "reasonably understood that, because he had not yet been trained, he was not to be exposed to a live explosive device at all." (¶¶ 59-60, 75.) The Complaint expressly alleges that Defendants "concealed the connection between those hazards and the injuries that killed him, thereby aggravating the harm." (¶ 75.) Had the true state of affairs not been concealed from him, Detective Lemus would never have stood beside the grenade during a demonstration conducted for his benefit; the concealment converted an injurious exposure into a fatal one. That is aggravation.

Defendants respond that Plaintiff alleges concealment of "hazards" rather than of an "injury." (Mot., Dkt. 6, at 6.) That argument construes the Complaint against the pleader, inverting the Rule 12(b)(6) standard, and it draws a line the cases do not support at the pleading stage. In *Johns-Manville*, 27 Cal. 3d at 477, the court permitted an aggravation claim where the employer knew the employee was being injured by his working conditions and concealed that knowledge, and *Foster*, 40 Cal. 3d at 312, held general allegations of knowledge and concealment sufficient; when an employer's knowledge of a hazard ripened into knowledge of an injury is itself a question of fact. Defendants' own authorities were decided on materially thinner allegations: in *Lazo v. Mobil Oil Refining Corp.*, No. CV-14-1072-ABC-JCx, 2014

U.S. Dist. LEXIS 195036, at *6-7, 2014 WL 12596424, at *3 (C.D. Cal. May 30, 2014), and *Scovill v. Siemens Mobility, Inc.*, No. 2:25-cv-01081-TLN-SCR, 2026 U.S. Dist. LEXIS 172327, at *7-9, 2026 WL 2225720, at *3-4 (E.D. Cal. Aug. 3, 2026), the plaintiffs failed to plead the employer's knowledge of the injury at all. Here knowledge is pleaded in detail, including written warnings that "someone would be killed" (¶ 36), Detective Lemus's own documented safety complaints (¶¶ 50-51), and Cal/OSHA's subsequent willful citations for failure to correct known unsafe conditions (¶ 66). At minimum, whether Defendants' concealment of the grenades' true, live condition, from the one man entitled by Department policy to be kept away from them, constitutes concealment of an injury and its connection with employment cannot be resolved against Plaintiff on the pleadings.

**2. The Fermino Exception and the Dual Capacity Doctrine Present Questions That Cannot Be Resolved on the Pleadings; at Minimum, Amendment Is Proper.**

Under *Fermino v. Fedco, Inc.*, 7 Cal. 4th 701, 713-15 (1994), the exclusivity analysis turns on whether the employer's conduct is "a normal part of the employment relationship," *id.* at 713, or instead falls among the "types of intentional employer conduct which bring the employer beyond the boundaries of the compensation bargain, for which a civil action may be brought," *id.* at 714, because the employer has "stepped out of" its proper role, *id.* at 708 (internal quotation marks omitted). Plaintiff acknowledges that ordinary, even reckless, safety failures lie within the compensation bargain. But the Complaint alleges more than safety failures: it alleges a retaliatory, pretextual transfer imposed as punishment to benefit a crony (¶¶ 45-47), the deliberate trading away of the unit's scheduled safety training to staff protection details and a commercial music video shoot (¶¶ 42, 57), and a documented institutional decision to accept "the risk of catastrophic injury or death to its deputies as the price of the savings" (¶ 33). Whether that course of conduct exceeds the boundaries of the compensation bargain is at least a factual question. Should the



TORRES | SIEGRIST

Court conclude the current allegations do not suffice under *Fermino* or the dual capacity doctrine, Plaintiff requests leave to amend; these are quintessentially fact bound doctrines, and discovery (which Defendants have obstructed even as against Cal/OSHA (¶ 65)) bears directly on them.

**3. Exclusivity Does Not Touch the Federal Claims.**

Defendants do not, and could not, contend that workers' compensation exclusivity reaches Plaintiff's Section 1983 claim. (¶ 76.) The exclusivity argument is therefore confined to the First Cause of Action.

**B. The Complaint States Claims Under Section 1983.**

**1. The Complaint Pleads Deliberate Indifference and Affirmative Conduct, Not "Mere Negligence."**

Defendants' framing of the Second Cause of Action as constitutionalized negligence ignores what the Complaint actually alleges. *County of Sacramento v. Lewis* itself holds that where officials have "the luxury ... of having time to make unhurried judgments," conduct that is deliberately indifferent to a known danger may shock the conscience. 523 U.S. 833, 853 (1998); *accord Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Defendants here had not seconds but years to deliberate, in the face of written warnings that death was coming. (¶¶ 33-36, 50-51.) *Daniels v. Williams*, 474 U.S. 327, 328 (1986), involving a slip on a negligently placed pillow, has nothing to say about that.

**2. The State Created Danger Doctrine Applies.**

A substantive due process claim lies where state actors "affirmatively place[] the plaintiff in a position of danger, that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced," with deliberate indifference to a known or obvious danger. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (quotation omitted); *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019).

Critically, the Ninth Circuit has repeatedly applied the doctrine in exactly this



TORRES | SIEGRIST

setting: a public employer's affirmative endangerment of its own employee. In *L.W. v. Grubbs*, 974 F.2d 119, 121-23 (9th Cir. 1992), prison officials who assigned a nurse to work alone with a violent sex offender, after assuring her she would not be so assigned, were held subject to suit, and *Collins v. City of Harker Heights*, 503 U.S. 115 (1992), the case on which Defendants' entire "workplace" theory rests, was expressly distinguished, 974 F.2d at 122, because the *Grubbs* plaintiff, unlike the *Collins* plaintiff, alleged affirmative acts that created the danger. In *Pauluk v. Savage*, 836 F.3d 1117, 1122-25 (9th Cir. 2016), the doctrine reached a county employee's death from workplace toxic mold exposure. And in *Polanco v. Diaz*, 76 F.4th at 923-24, 926-29, the family of a San Quentin correctional officer who died of COVID-19 stated a claim where officials transferred infected inmates into a previously uninfected prison over expert warnings. *Collins*, which involved a failure to train and warn rather than any affirmative act, 503 U.S. at 117-18, 128, does not immunize public employers from the consequences of affirmatively created dangers; *Grubbs*, *Pauluk*, and *Polanco* establish as much.

**Affirmative acts.** The Complaint alleges a series of affirmative acts, not omissions dressed in active verbs:

First, Defendants took custody of unverified military ordnance, pronounced it inert on the strength of a diagnostic device known to be unreliable, transported it over public streets, stored it overnight, and brought it onto the grounds of the SEB facility. (¶¶ 54-56.) As in *Polanco*, where the defendants "brought" the danger into a previously safe environment, 76 F.4th at 927, the Biscailuz Center contained no live grenade until Defendants delivered one and mislabeled it safe.

Second, Defendants directed Detective Lemus to report to that facility on the morning of July 18 (¶ 57), and "permitted and/or directed" untrained personnel, including Lemus, to handle the grenades (¶ 81(h)), which were then used as a training demonstration "for Detective Lemus." (¶ 59.)

Third, Defendants' inert determination was precisely the "misrepresentation as

to the risk" that *Kennedy* treats as "an additional and aggravating factor" making a plaintiff "more vulnerable to the danger" already created: Detective Lemus, untrained by the Department's own choice, was "wholly reliant upon the expertise of the colleagues to whom the Department had assigned him," reasonably presumed the device had been rendered safe, and reasonably understood that under Department policy he would not be exposed to a live device at all. (¶¶ 48, 59-60); *Kennedy*, 439 F.3d at 1063 (quoting *Grubbs*, 974 F.2d at 121 (defendants "enhanced [the plaintiff's] vulnerability to attack by misrepresenting to her the risks")).

Fourth, Defendants involuntarily transferred an untrained deputy into the bomb squad as retaliation and kept him there over his documented objections. (¶¶ 46-47, 50-51.) Defendants protest that the transfer was "too remote," but remoteness is a causation argument, and proximate cause is a quintessential jury question; in any event the transfer was only the first link in a chain of affirmative conduct that continued through the morning of the explosion.

**Particularized danger.** Defendants' reliance on *Sinclair v. City of Seattle*, 61 F.4th 674, 683 (9th Cir. 2023), inverts the facts. *Sinclair* involved a danger to the public at large. Here, the danger was directed at an identified and specific set of victims: the three detectives, and specifically Detective Lemus, for whom the grenade was being used as a demonstration. (¶ 59.) That the Department's misconduct also endangered the public during transport does not make the danger to Lemus, standing beside the grenade at the moment Defendants' misrepresentations bore their consequences, any less particularized. *Grubbs*, *Pauluk*, and *Polanco* all involved dangers "particularized" to an employee in exactly this way. *See Polanco*, 76 F.4th at 927 (danger to a "discrete and identifiable group," there prison guards and inmates, was sufficiently particularized).

**Deliberate indifference.** The standard requires that the defendant "recognize[] [an] unreasonable risk and actually intend[] to expose the plaintiff to such risks without regard to the consequences to the plaintiff," that is, that he "knows



TORRES | SIEGRIST

that something is going to happen but ignores the risk." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011) (quoting *L.W. v. Grubbs*, 92 F.3d 894, 899-900 (9th Cir. 1996)). It does not require knowledge that the specific grenade was live; it requires disregard of a known or obvious danger. The Complaint alleges: written warnings to named command staff that the unit's training deficiencies would kill someone (¶¶ 35-36); Detective Lemus's own repeated, documented safety complaints and training requests, which were ignored or treated as grounds for disfavor (¶¶ 50-51); actual knowledge that the X-ray equipment on which any inert determination depended was unreliable (¶ 30); a Department policy, necessarily premised on the recognition that unverified ordnance may be live, prohibiting untrained personnel from the immediate presence of live devices (¶ 48); and Cal/OSHA's willful citations for failure to correct known unsafe conditions (¶ 66). In *Polanco*, 76 F.4th at 928-29, disregarding expert warnings sufficed. Defendants' insistence that they believed the grenades inert simply restates the deliberate indifference question: a belief founded on a diagnostic device Defendants knew to be unreliable, deployed by personnel Defendants knew to be undertrained, under procedures Defendants knew did not exist, is the ignoring of a known risk, not a defense to it. *Herrera v. L.A. Unified Sch. Dist.*, No. SACV-17-00069-JVS-KESx, 2018 U.S. Dist. LEXIS 217001, at *27, 2018 WL 3816741, at *9 (C.D. Cal. July 3, 2018), *aff'd*, 18 F.4th 1156 (9th Cir. 2021), a summary judgment decision in which the defendant was unaware of any immediate danger, is inapposite on the pleadings here at the Motion to Dismiss stage.

### 3. The Complaint States a Monell Claim.

**Underlying constitutional deprivations.** Defendants' first premise, that no constitutional deprivation is alleged, fails for the reasons above: the Complaint pleads deprivations of Detective Lemus's life and of Plaintiff's protected familial relationship through conscience shocking deliberate indifference, and, separately, the violation of Plaintiff's right against unwarranted exploitation of her father's death images. *Marsh v. County of San Diego*, 680 F.3d 1148, 1154-55 (9th Cir. 2012).



TORRES | SIEGRIST

**Policy, custom, and failure to train.** The Complaint identifies specific municipal policies and customs and pleads the "deliberate choice to follow a course of action ... made from among various alternatives" that *Monell* requires, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986): a decade long policy of defunding the AED, adopted for cost savings with knowledge of the resulting dangers (¶¶ 25-26, 33); a custom of assigning untrained personnel to bomb squad duties (¶¶ 47-53); and a failure to train that fits *City of Canton*'s core example of obviousness. *Canton* reserved *Monell* liability for the situation in which "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that policymakers are deliberately indifferent. 489 U.S. 378, 390 (1989). It is difficult to imagine a more obvious training need than the only formal instruction available to a bomb squad, nor an inadequacy more likely to result in death, and here the obviousness is not hypothesized but documented: veteran personnel put it in writing, and a deputy told the unit's Captain someone would be killed. (¶¶ 35-36.)

Defendants argue their formal policy, that personnel may not be near live ordnance before HDS training, "belies" *Monell* liability. (Mot., Dkt. 6, at 16.) The argument refutes itself: the Complaint alleges that the actual, operative practice was the opposite of the paper policy, that untrained personnel, including Detective Lemus, performed bomb squad duties for months and were placed in the presence of unverified ordnance. (¶¶ 47-53, 58-59.) A municipality is liable for its "longstanding practice or custom which constitutes the standard operating procedure," *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), and a persistent practice at odds with a written policy is a classic *Monell* custom. *See Navarro v. Block*, 72 F.3d 712, 714-15 (9th Cir. 1995) (testimony that dispatchers' actual practice departed from official policy raised a triable issue of custom; reversing summary judgment). The Complaint likewise pleads moving force causation: it was these policies and customs, not happenstance, that placed an untrained deputy beside unverified ordnance



TORRES | SIEGRIST

pronounced safe by obsolete equipment. (¶¶ 91, 93.) The same answer disposes of Defendants' demand for "prior incidents": the Complaint does not allege an isolated act by a rogue employee but a continuous, institution wide condition, maintained over a decade, documented in internal warnings, and confirmed by two willful Cal/OSHA citations. Whether the practice was sufficiently "widespread" is a factual question ill suited to resolution on the pleadings.

**The death images custom and ratification.** As to the photographs, Defendants' argument rests on a misreading of the Complaint. The Complaint alleges a "longstanding, well documented custom and practice of LASD personnel taking and sharing unauthorized photographs of decedents at death scenes," of which the County and Luna had express notice "since at least September 2020 through the *Bryant* litigation." (¶¶ 70, 93.) It further alleges that despite the Kobe *Bryant* Act and a formal policy, a Commander, the very rank charged with enforcing that policy, openly photographed the remains of the Department's own detectives at a highly publicized scene, announced "This is going to be a good picture," kept the images, and shared them, and that Luna thereafter failed to discipline him, failed to confiscate the phone, failed to trace or contain the circulation of the images, and that the Department attempted to conceal the photographs' existence from the family. (¶¶ 69, 71-72.) A formal policy that command staff treat as "a dead letter" (¶ 72) is no answer to *Monell*; it is the predicate for it. And ratification is adequately pleaded: Plaintiff does not rely on a "mere failure to discipline," *Dodge v. Evergreen Sch. Dist. No. 114*, 56 F.4th 767, 788 (9th Cir. 2022), but on a final policymaker's affirmative response to a known violation: retention and promotion, concealment from the victims, and preservation of the offender's continued possession of the images. *See Larez v. City of Los Angeles*, 946 F.2d 630, 646-47 (9th Cir. 1991) (ratification and failure to discipline by chief policymaker). Defendants' timeline quibble about when Luna promoted Giandomenico is a factual dispute, and an irrelevant one, because promotion is only one of the ratifying acts alleged.



TORRES | SIEGRIST

TORRES | SIEGRIST

### 4. Plaintiff's Familial Association Claim Rests on Binding Ninth Circuit Precedent That This Court Must Follow.

For nearly four decades the Ninth Circuit has recognized that a child possesses a Fourteenth Amendment liberty interest in the companionship and society of her parent, actionable under Section 1983 when official conduct shocking the conscience causes the parent's death. *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991); *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *Porter*, 546 F.3d at 1137; *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013). These holdings postdate *Washington v. Glucksberg*, 521 U.S. 702 (1997), by as much as a quarter century. The en banc Ninth Circuit left this framework intact in *Estate of Hernandez v. City of Los Angeles*, 139 F.4th 790, 804 (9th Cir. 2025) (en banc), *cert. denied*, No. 25-538 (U.S. June 22, 2026), adopting the panel's analysis, which applied *Wilkinson* and recognized "a child's interest in her relationship with a parent," *Estate of Hernandez v. City of Los Angeles*, 96 F.4th 1209, 1221 (9th Cir. 2024) (quotation omitted); the passage Defendants quote is from Judge R. Nelson's separate opinion, which itself acknowledges that "it is now blackletter law in this circuit that a child has a constitutionally recognized interest in the companionship of her parents." *Id.* at 814 (R. Nelson, J., concurring in part and dissenting in part). The City's ensuing petition for certiorari did not even ask the Supreme Court to revisit that precedent; the petition, which presented only Fourth Amendment excessive force and qualified immunity questions, was denied on June 22, 2026.

The rule of decision is therefore straightforward. A district court remains bound by Ninth Circuit precedent unless intervening higher authority is "clearly irreconcilable" with it. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). *Glucksberg*, a 1997 decision about physician assisted suicide, is not intervening as to *Curnow* (1991) in any event, and the Ninth Circuit has continued to recognize and apply the familial association right for decades after *Glucksberg*, through 2025. Defendants' citation to *Garcia v. Benov*, 715 F. Supp. 2d 974, 996

TORRES | SIEGRIST

(C.D. Cal. 2009), for the proposition that a district court need not follow circuit authority that "is overruled by the Supreme Court" (Mot., Dkt. 6, at 18), describes a situation that does not exist here: *Glucksberg* did not overrule *Curnow* or its progeny. Defendants' invitation to this Court to overrule *Curnow*, *Wilkinson*, *Porter*, and *Lemire* because a minority of the en banc court would, and one other circuit has, *see Chambers v. Sanders*, 63 F.4th 1092, 1097-99 (6th Cir. 2023), is an invitation to error. The claim also independently rests on *Marsh*, which holds that the Constitution protects a family member's right to control the death images of a decedent against unwarranted exploitation by the government, 680 F.3d at 1154-55; Defendants' assertion that no dissemination is alleged is simply incorrect (¶¶ 69, 71, 73), and whether Giandomenico's admitted sharing of the images "with others for no law enforcement purpose" (¶ 69) amounts to the exploitation *Marsh* condemns cannot be resolved against Plaintiff on the pleadings.

**5. Qualified Immunity Cannot Be Resolved on This Record, and in Any Event the Rights Were Clearly Established.**

Dismissal on qualified immunity grounds "is not appropriate unless [the court] can determine, based on the complaint itself, that qualified immunity applies." *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (quotation omitted); *see Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) (plaintiffs are "entitled to go forward" where the complaint "contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right") (quotation omitted). Qualified immunity is also unavailable to the County and LASD, and irrelevant to the official capacity claims; the defense belongs to Luna individually, at most.

As to Luna, *Polanco* is dispositive of the "clearly established" question in this posture. There, the Ninth Circuit held, in 2023, that *Grubbs* and *Pauluk* "clearly established" that a state actor violates due process by affirmatively exposing an employee to a known, foreseeable danger with deliberate indifference, and affirmed

the denial of qualified immunity to prison officials on facts strikingly parallel to these: a workplace death, expert warnings disregarded, and the affirmative introduction of a lethal hazard into the employee's workplace. *Polanco*, 76 F.4th at 923-24, 930-31. By July 2025, then, controlling authority placed the unconstitutionality of Luna's alleged conduct beyond debate; no reasonable sheriff could believe that the Constitution permitted him, over explicit written warnings of impending death, to maintain untrained personnel in a bomb squad, deny them the only formal training in existence, and expose them to unverified live ordnance mislabeled as inert. *Kisela v. Hughes*, 584 U.S. 100 (2018) (per curiam), a split second excessive force case, supplies no contrary principle. As to the familial association and death images claims, *Curnow* and its progeny, and *Marsh* (2012), respectively, gave fair warning. Whether Luna's personal participation, knowledge, and acquiescence suffice, *see Starr v. Baca*, 652 F.3d 1202, 1206-08 (9th Cir. 2011) (denying dismissal of supervisory claims against Sheriff of Los Angeles County), presents factual questions that cannot be answered before an answer is even filed.

**C. At Minimum, Leave to Amend Must Be Granted.**

Dismissal with prejudice would be error. The Court "should freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), and leave is granted with "extreme liberality," *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003); and denial requires a showing that amendment would be futile, *Lopez*, 203 F.3d at 1130. Defendants' futility argument assumes their merits arguments; it also ignores that facts bearing on concealment, knowledge, custom, and ratification lie peculiarly within Defendants' possession, and that Defendants have already demonstrated, in their response to Cal/OSHA's subpoena, how they intend to treat requests for that information. (¶ 65.) Plaintiff has not previously amended. If the Court grants any part of the Motion, Plaintiff respectfully requests leave to amend.

///



TORRES | SIEGRIST

## V. CONCLUSION

The Motion should be denied in its entirety. In the alternative, Plaintiff requests leave to amend any claim the Court finds deficient.

**Date: September 9, 2026**

TORRES | SIEGRIST

By:______________________________

**DAVID G. TORRES-SIEGRIST**
**Attorneys for Plaintiff ALEXIS LEMUS**

TORRES | SIEGRIST

**CERTIFICATE OF COMPLIANCE L.R. 11-6.1.**

The undersigned, counsel of record for Plaintiff Alexis Lemus, certifies that this brief contains 5,320 words, which:

_x_ complies with the word limit of L.R. 11-6.1.

The memorandum also complies with the 25-page limit for oppositions set by paragraph 9(d) of the Court's Initial Standing Order for Civil Cases.

**Date: September 9, 2026**

TORRES | SIEGRIST

**By:**______________________________

**DAVID G. TORRES-SIEGRIST**
**Attorneys for Plaintiff ALEXIS LEMUS**

## CERTIFICATE OF SERVICE

**I hereby certify that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that service was perfected on all counsel of record and interested parties through this system.**

**Date: September 9, 2026**

TORRES | SIEGRIST

**By:**______________________________

**DAVID G. TORRES-SIEGRIST**
**Attorneys for Plaintiff ALEXIS LEMUS**